**David W. BROWN, Private E-2 RA 11 797 464, Petitioner,**

v.

**Hon. Robert S. McNAMARA, Secretary of Defense, Hon. Stanley R. Resor, Secretary of the Army, Major General John M. Hightower, Commanding General, U. S. Army Training Center, Infantry, U. S. Army, Fort Dix, New Jersey, Respondents.**

**Civ. No. 1186–66.**

United States District Court
D. New Jersey.

Jan. 31, 1967.

Emerson L. Darnell, Mount Holly, N. J., and Eleanor Holmes Norton, New York City, for petitioner.

David M. Satz, Jr., U. S. Atty., by Wilbur H. Mathesius, Asst. U. S. Atty., for respondents.

## AMENDED OPINION

LANE, District Judge:

On or about May 17, 1966, David W. Brown, just prior to his twenty-first birthday, enlisted in the United States Army for a period of three years. Private Brown was assigned to Fort Dix, New Jersey, for an eight-week basic Army combat training course. After completing two weeks of the course, it is alleged that Private Brown's thoughts crystallized to the point where he was compelled to conclude that by reason of his religious training and belief, he was unable to serve as a soldier in the United States Army. Brown informed his superior officers of this and refused to proceed further with combat training.

On June 28, 1966, Private Brown submitted a Personal Action Form (DA Form 1049) requesting a discharge pursuant to Department of Defense Directive (DOD) No. 1300.6 and Army Regulation (AR) No. 635–20. The Defense Department Directive was issued by the Secretary of Defense under his general power to control the Department of Defense, 10 U.S.C. § 133. The stated purpose of the directive was to establish "uniform procedures for the utilization of conscientious objectors in the Armed Forces and consideration of requests for discharge on the grounds of conscientious objection." DOD 1300.6, pt. I. These procedures apply to "all personnel of the Army, Navy, Air Force and Marine Corps and to all Reserve components thereof." DOD 1300.6, pt. II.

Part III of the directive is headed "POLICY" and is composed of seven paragraphs lettered A. to G. The general content of this material is as follows: A. That an administrative discharge prior to completion of term of service is discretionary based on the facts of each case and no one has a vested right to such a discharge. B. That consistent with the national policy of not inducting conscientious objectors (I–O classification) such claims will also be recognized when made by members of the Armed Forces to the extent practicable and equitable. C. That such claims will not be entertained if the conscientious objector's beliefs existed prior to his entering the armed forces. D. That final determination of the request should be made by the departmental headquarters of the individual's service after consideration of the circumstances in the particular case and the pertinent criteria. E. That great care should be used to insure that the claim is sincere so that the procedure is not abused and in making this determination the claim should be judged by the same standard as is used in judging a pre-induction claim. F. That the standards used by the Selective Service System in determining I–O or I–A–O classification of draft registrants prior to induction are considered appropriate for judging the conscientious objector claims of those who are already members of the armed forces. G. That in order to insure the maximum practicable uniformity among the services and between members of the same service, an advisory opinion of the Selective Service that an I–O classification is appropriate will normally be a requisite for discharge based on conscientious objection of persons who have served less than two years of active service.

Part IV of the directive sets forth some guidelines as to the criteria to be

used in evaluating the claim and emphasizes the point that the objection must be religious. It states that affiliation with particular groups does not result in automatic classification and that lack of such affiliation does not preclude conscientious objector status. It also recognizes that there are no absolute objective measurements which can be applied across the board.

Part V of the directive sets forth the procedure to be employed. Paragraphs C. and D. under this part contain the provisions applicable to the instant case. They provide in pertinent part that a person requesting discharge because of conscientious objection is required to furnish certain information deemed appropriate by the military department concerned and, in addition, may submit other information he deems appropriate. These materials together with other information supplied by the applicant's immediate command are then forwarded to the departmental headquarters for determination. Before the departmental headquarters makes a determination concerning the discharge of persons who have actively served for less than two years, the case is forwarded to the Director of the Selective Service System for an advisory opinion as to the applicant's proper classification under the Universal Military Training and Service Act. If a classification of I–O is recommended the person will be considered for discharge. If a classification of I–A–O is recommended, discharge will not be granted, but the individual will be considered for assignment to non-combatant duties. Persons for whom neither of the above classifications is recommended will normally be retained in military service, subject to normal duty assignments. If the individual who has been denied discharge demonstrates continued unwillingness to serve, he will be subject to disciplinary action just as any other member of the armed forces who demonstrates similar behavior. Paragraph F. provides that determination by the military department, in accordance with the facts of the case and the guidelines, shall be final with respect to the administrative separation of its members.

Following the issuance of DOD 1300.6, Army Regulation 635–20 was promulgated by order of the Secretary of the Army pursuant to his authority under 10 U.S.C. § 3012 and 10 U.S.C. § 3811. This regulation contains most of the information embodied in DOD 1300.6 and under part 4 sets out the information required of the applicant on his DA Form 1049. In addition it provides that the individual requesting discharge will receive a counseling interview by a chaplain and a psychiatric interview with a psychiatrist. The chaplain is to report on the sincerity of the individual's belief and whether it is religious. The psychiatrist's report passes on whether there is anything to indicate the need of disposition through medical channels. These reports and the information supplied by the applicant are forwarded through military channels to the Adjutant General, together with certain comments thereon by the unit commander including his recommendation and reasons therefor. It is the Adjutant General who effects coordination with the Selective Service System.

Part 5 of AR 635–20 provides that the individual requesting discharge based on conscientious objection will be retained in his unit and assigned duties providing the minimum of conflict with his professed beliefs pending a final decision on his application.

Private Brown followed the procedures outlined in DOD 1300.6 and AR 635–20. In addition to submitting the required information he also had information submitted on his behalf by various people including the Methodist Chaplain and Assistant Methodist Chaplain at Yale University; a minister who was on the staff at the Wesley Foundation at Yale University; the pastor of the First Methodist Church, New Haven, Connecticut; and Private Brown's wife. This information, together with information supplied by various military personnel was submitted to the Adjutant

General who then forwarded it to the Director of the Selective Service System. The Director's advisory opinion was that Private Brown would not be properly classified in I–O or I–A–O if he were being considered for induction. Subsequent to this evaluation the Adjutant General denied the application for discharge and found that Brown should be "retained on active duty without assignment limitations to complete his obligated period of service * * *."

Brown was then ordered to draw combat equipment. He refused and charges were preferred against him under 10 U.S.C. § 891. On October 15, 1966, he was tried and convicted by Special Court-Martial and sentenced to three months confinement at hard labor. This sentence was suspended on the same day by the reviewing authority. On October 17, 1966, Brown was again ordered to draw combat equipment. He again refused and charges were preferred under 10 U.S.C. § 890. A pre-trial investigation was conducted pursuant to 10 U.S.C. § 832 and it was decided that instead of holding a second court-martial, the suspension of the first sentence should be vacated and Private Brown was ordered into confinement on November 16, 1966.

On November 29, 1966, a petition for a writ of habeas corpus was filed with this court under 28 U.S.C. § 2241, naming as respondents the Honorable Robert S. McNamara, Secretary of Defense; Honorable Stanley R. Resor, Secretary of the Army; and Major General John M. Hightower, Commanding General, U. S. Army Training Center, Infantry, U. S. Army, Fort Dix, New Jersey. It is petitioner's contention that he is being held in violation of his rights in that (a) denial of his application for discharge was in violation of 50 U.S.C. App. § 456(j), DOD 1300.6, and AR 635–20; (b) denial of his application for discharge was in violation of the due process clause of the fifth amendment because it was arbitrary and without any basis in fact; (c) denial of his application for discharge was in violation

of the due process clause of the fifth amendment because no hearing was held and no reason for the denial of discharge was given; (d) denial of his application for discharge was a violation of equal protection of laws because he was not given the hearing rights accorded those seeking conscientious objector status prior to entering the armed forces and this differential treatment is without rational basis. We signed an Order to Show Cause on November 29, 1966.

Certain individuals have firm and sincere religious beliefs which make them conscientiously opposed to participation in the armed forces. Although not constitutionally compelled, recognition has been given to these beliefs in the form of an exemption from military training and service. See 50 U.S.C. App. § 456(j). This statutory exemption is a matter of legislative grace and has long been recognized as such. See, e. g., Fleming v. United States, 344 F.2d 912, 915 (10th Cir. 1965); Clark v. United States, 236 F.2d 13, 23 (9th Cir.), cert. denied, 352 U.S. 882, 77 S.Ct. 101, 1 L.Ed.2d 80 (1956); United States v. Kenstler, 250 F.Supp. 833, 834 (W.D. Pa.1966).

If an individual is denied an exempt classification by his local board the statute gives him a right to appeal the denial to a board of appeals. After this appeal the registrant has no further administrative appeal and cannot directly attack the classification in court. If he still feels that his classification is incorrect his recourse is to refuse to submit to induction and then assert the allegedly improper classification as a defense in a criminal prosecution, see Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953); Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946); or to bring a habeas corpus action after he has been called for service and inducted. Cf. Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); Cox v. Wedemeyer, 192 F.2d 920 (9th Cir. 1951). In either case the scope of judicial review is limited to a determina-

tion of whether there is any basis in fact for the classification. See Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946). The procedures provided by 50 U.S.C. App. § 456 (j) apply only to the classification process for those who have not yet been inducted into the armed forces. Thus, petitioner, who voluntarily enlisted in the Army, does not come within its provisions.

However, in furtherance of the national policy given expression in 50 U.S.C. App. § 456(j), the Department of Defense has seen fit to provide a procedure for evaluating the claims of members of the armed forces who, after induction, have developed religious beliefs which make them conscientiously opposed to participation in the armed services or combatant aspects thereof. The procedure is set forth in DOD 1300.6 which is an executive directive rather than a congressional mandate. Like the statute relating to pre-induction classification, the directive in question here is not the result of constitutional compulsion.

■■ With this as a background, we will deal with the contention that the lack of a hearing in the post-induction procedure denied petitioner equal protection because pre-induction applicants are given this right. Our answer to this is that the necessity of the armed services to order and control those already within its operation is a sufficiently rational basis for such a distinction. As the Court recognized in Burns v. Wilson, 346 U.S. 137, 139–140, 73 S.Ct. 1045, 1048, 97 L.Ed. 1508 (1953), the rights of members of the armed forces are not always as great as those of civilians because "the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty * * *." In fact, the

basis for affording differential treatment is so compelling that we feel that the Secretary of Defense could, without violating any constitutional rights, totally deny a procedure for dealing with the claims of "conscientious objectors" who have been properly inducted into the armed forces. Thus, we are unable to conclude that there has been a violation here merely because no hearing is required. See also In re Kanewske, 260 F.Supp. 521, 523 (N.D.Cal.1966).

■■ However, even though the Constitution does not require a procedure whereby post-induction conscientious objectors can have their claims passed upon, once such a procedure is established and put into operation it must be administered in a manner which provides equal protection of laws [1] to all those to whom it is open. Cf. Griffin v. People of State of Illinois, 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891 (1956). Our review of the procedural aspects of the directive and implementing regulation compels us to conclude that it is designed to assure the maximum of uniformity of treatment of those covered. Determinations are made at departmental headquarters after the applicant is given the opportunity to submit whatever information he desires. The determination is made only after the Director of Selective Service evaluates the materials and gives an advisory opinion.[2] The procedure thus provides a centralized system removed from local prejudices and interpretations. We feel that the insulation provided by this procedure assures a high degree of equal protection. We thus conclude that the administrative scheme set up by the Department of Defense and the Army does not of itself result in any constitutional violation.

In the instant case the prescribed procedures were followed and it was

---

1. See Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) which appears to incorporate the equal protection clause into the fifth amendment.

2. It should be noted that the implementation of this advisory opinion technique coupled with employing the standards used by the Selective Service in making pre-induction classifications also affords substantial uniformity between the determination relating to the pre- and post-induction applicant for conscientious objector status.

determined that petitioner was not entitled to either I–O or I–A–O classification. We are now asked to review this determination, it being alleged that it was arbitrary and without basis in fact.

We are dealing here with matters within the control of the Secretary of the Army. Article I, § 8, cl. 14 of our Constitution provides that the President shall be the Commander in Chief of the Army and Navy of the United States and that Congress shall have power to make rules for the government and regulations of the land and naval forces. To a large extent this power has been delegated to the executive branch. Section 3012 of 10 U.S.C. gives the Secretary of the Army broad authority and responsibility with respect to the conduct of the affairs of the Army and in particular his power to discharge enlisted members of the Army before their term of services expires is expressly granted in section 3811(b) of 10 U.S.C.

The administrative scheme with which we are dealing is designed to create a minimum of disruption of the internal affairs of the Army,—the decision of the departmental headquarters is final. The matter is thus expeditiously handled and during the pendency of the proceedings the applicant is reassigned to duties providing a minimum of conflict with his professed beliefs. If discharge or assignment to non-combatant service is denied, he is then returned to normal service and treated like other members of the military.

 It is our belief that this is where the matter should end. It should not be prolonged by bringing the controversy into the courts of law. Cf. Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 305, 64 S.Ct. 95, 88 L.Ed. 61 (1943). In arriving at the decision of whether to accept jurisdiction, we feel that the effect on the military of judicial involvement in the administrative scheme is a very relevant consideration. Acceptance by us of jurisdiction to review the factual basis of the administrative determination could seriously disrupt the internal operations of the military. By the time the matter was reviewed by us and disposed of on appeal an additional year would ensue before "final" determination. However, without review by the judiciary the military can render a "final" decision within a relatively short period of time.

Under the present scheme during the pendency of the administrative determination the military tries to assign the applicant to a non-combatant job. If we were to accept jurisdiction, would the military be expected to set this man aside for the additional time which it takes for his case to move through the courts? [3] The question causes us great concern. The reason that we are so concerned with the status of the applicant while his case is pending relates to the very nature of the claim of conscientious objection. It appears to us that it will be very difficult for the military to effectively integrate these applicants into any form of combatant training or service while their cases are still being acted upon. It is likely that these applicants will face court martials rather than comply with orders, so they will be able to reinforce the evidence as to the sincerity of their beliefs and their entitlement to discharge or reassignment.[4]

We do not wish to foster a situation which results in having part of what is supposed to be our active force immobile and entangled in litigation. How can the military efficiently devote its facilities and personnel to training a military unit if it cannot rely on those who have been properly inducted and are subject to its control? It is one thing for the courts to be in the middle of the thicket on the issue of pre-induction classification and on the issue of

3. Admittedly, they are able to absorb those who have been classified I-A-O and assigned to non-combatant service, but in those cases the man has already proved that he is entitled to the classification.

4. While they may continue even after their cases are final, we do not feel that it will occur with as much frequency.

whether the proper form of discharge has been granted. Such litigation at the beginning and end of the military term of service is not nearly as disruptive to the function of the armed services as that which threatens the very utilization of the manpower which has been assembled for active service.

In those cases in which the courts have accepted jurisdiction to review matters relating to persons already in the military the question involved something more than whether the factual determination was valid. In Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953), the question was whether induction was valid, and in Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958), the question was whether the military was acting within its statutory authority. In our case the petitioner has been properly inducted and it is not alleged that the procedure used was in excess of statutory power. We are asked here merely to determine if there is any basis in fact for the determination which was made by the adjutant general. Even this narrow scope of review could result in the disruption of military operations discussed above. It is our feeling that the benefits to be derived from the added safeguard of having us review the administrative determination are outweighed by the burdens on the military which would result. Consequently, we refuse to accept jurisdiction to pass on the factual adequacy of administrative decision.

Although jurisdiction to review administrative findings is not always spoken of in terms of the burden-benefit analysis, the statement by the Supreme Court in Orloff v. Willoughby, supra, 345 U.S. at 93–94, 73 S.Ct. at 540, is just another way of enunciating it. There the Court stated:

"We know that from top to bottom of the Army the complaint is often made, and sometimes with justification, that there is discrimination, fa-

voritism or other objectionable handling of men. But judges are not given the task of running the Army. The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters."

Judge Prettyman in Harmon v. Brucker, 100 U.S.App.D.C. 190, 243 F.2d 613, 619 (1957), rev'd on other grounds, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958), chose to express this idea in terms of the separation of powers:

"Reason, flowing from the doctrine of the separation of powers, dictates that in many fields the administrative discretion of the executive branch and the legislative discretion of the legislative branch be not subject to interference or review by the courts. In no field is this doctrine more pertinent and important than in the operation of the armed forces. Provisions for the establishment and operation of such forces necessary to the security of this country are wholly legislative matters, and the administration of those forces is the very essence of executive action. The Constitution so provides. Only in the most extreme cases can the judiciary interfere in this area."

However our denial of jurisdiction is stated, the result is the same,—the determination of the adjutant general is final and is binding on the petitioner. Consequently, petitioner's retention in the Army and his detention pursuant to the Special Court-Martial are lawful and therefore he is not entitled to relief by way of habeas corpus.[5]

---

5. We do not pass judgment on the reasoning employed in Petition of Green, 156 F. Supp. 174 (S.D.Cal.1957), and the cases cited therein which would also support the result we reach.