James George **RAMEAKA**, Jr.

v.

Major Francis **KELLY**, Commanding Officer, Armed Forces, Entrance and Examining Station, Providence, Rhode Island, et al.

**Civ. A. No. 4674.**

United States District Court,
D. Rhode Island.

May 5, 1972.

Milton Stanzler, Providence, R. I., for plaintiff.

Lincoln C. Almond, U. S. Atty., R. I., and Joseph C. Johnston, Jr., Asst. U. S. Atty., R. I., Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

This is a petition for a Writ of Habeas Corpus seeking a discharge of the petitioner from the Reserve Officers Training Corps program and injunctive relief against the respondents, contending he is being illegally called to active duty as a result of a hearing by a Board of Officers which denied him procedural due process.

Jurisdiction is premised on 28 U.S.C., Sections 120, 2241 and 1391(e).

## FINDINGS OF FACT

The petitioner who had been a freshman and sophomore ROTC student at the University of Rhode Island, in September of 1969, prior to the commencement of his junior year signed an enlistment contract for Advanced ROTC training. Unlike the first two years, an enrollment in this program carries with it a commitment to military service which requires completion of the course and the acceptance of a commission, if tendered, to be followed by two years of active duty and further service as a member of a Regular or Reserve component of the Army until the sixth anniversary of the receipt of the commission, unless sooner terminated. Before acceptance, the prospective enrollee is required to execute an enlistment contract, a deferment agreement, and statements acknowledging his obligation for service and understanding of the service requirements, with a parental consent form if a minor. All of these documents were executed by this petitioner.

The charge against him which led to the questioned Board hearing is that he failed to fulfill his ROTC obligation. It appears that in September when he returned to school for his senior year, he had concluded he could not complete advanced military training because of financial hardship and the change in his life of a wife about to give birth. He could not see a military future in such a situation.

On September 18, 1970, he dropped the required military science course. Though he immediately reinstituted the course after contact by the Senior Instructor, he, nevertheless, became delinquent in a number of ways. Between the period of September 30, 1970 and December 9, 1970, he failed to attend 7 out of 28 classes; did not turn in 11 out of 12 homework assignments; did not give his only scheduled student presentation; of two one hour examinations given, he failed both with marks of 44 and 18 points below average; and of six quizzes, he failed all of them.

On November 9, 1970, the petitioner was advised by letter from his professor of Military Science that his performance had been " . . . markedly substandard" and that he was placed on probation. The letter additionally stated, "A further review of your record will be made *at the end of the semester.* If your performance has not improved to a level expected of a fourth year student in Military Science and a potential officer in the United States Army, *you may be considered for dismissal from the program and possible charges of willful violation of your contract."* (Emphasis added.)

On December 9, 1970, the petitioner was notified to appear before a Board of Officers on December 14, 1970.

Paragraph 1 of the December 9 notice reads:

"You are hereby notified that a Board of Officers will convene at 1500 hours, 14 December 1970 . . . to consider you *for possible disenrollment from the Advanced ROTC Program."* (Emphasis added.)

Paragraph 2 states:

"This action is being taken at this time due to your demonstrated performance, attitude, and aptitude during the current semester (Fall 1970–71)."

Paragraph 5 states:

"You are advised that you are entitled to have counsel present, either military or civilian, and that if you request military counsel, he will be appointed as a non-legally qualified counsel by the appointing authority. If you desire representation by civilian counsel, such civilian counsel will be provided at no expense to the government. . . "

At the opening of the hearing, the President of the Board stated:

". . . This is a Board of Officers called to determine your performance in the military science program and to determine if action should be taken as a result of your nonperformance to either disenroll you from the ROTC program *or to bring action against you* for willful evasion of your ROTC contract. At this time I would like to make you aware that if you desire, you may employ civilian counsel at your own expense for this hearing. Do you have such counsel?

A. No sir.

President: Do you wish such counsel?

A. No sir." (Emphasis added.)

On December 21, 1970, the Board findings[1] that he willfully evaded his

---

1. Findings of the Board were documented and introduced in evidence. It reads:

"1. The factors listed below as a. through j. are deemed by the Board as elements of proof to substantiate the findings which appear as paragraph 6 below.

a. On 18 September 1970, Cadet Rameaka, with full knowledge of his obligation to complete the course and without seeking counsel or advice from the Military Science Department dropped Military Science 330 from his curriculum.

b. Upon counsel from Major Malley, the Senior Instructor, Cadet Rameaka added Military Science 330 back into his curriculum on 30 September. He then failed to attend 7 classes from 30 September 1970 until 9 December 1970 during which time 28 classes were scheduled and did in-fact meet.

c. During the period 30 September to 9 December a total of 12 homework assignments were given. Cadet Rameaka turned in the first one and received a below average grade. He failed to turn in the remaining 11 assignments thereby receiving a grade of zero for those.

d. Cadet Rameaka failed to give his only scheduled student presentation (on 13 November) because he was absent from class without an excuse.

e. Of the two, one hour examinations given during Cadet Rameaka's enrollment, he failed both with marks 44 points below average and 18 points below average, respectively.

f. Of the six quizzes administered during Cadet Rameaka's enrollment and attendance, he failed all of them.

g. That, by his own admission, Cadet Rameaka did not intend to complete Military Science 330.

contract were approved and on January 6, 1971, the proceedings were transmitted to the First Army recommending disenrollment. These proceedings were forwarded pursuant to C1 AR 145–1 with a Department of the Army Form numbered 1574 entitled, "Report of Proceedings by Investigating Officer."[2] It is a check list setting forth a number of questions which must be answered "Yes" or "No" by way of an appropriate check mark. Question No. 4 reads:

> "Each notification stated the specific allegations or questions to be investigated."

The answer checked is "Yes."

On June 21, 1971, the First Army notified the petitioner that on July 27, 1971, he was ordered to active duty for willful evasion of his ROTC obligations. To complete the chain of events, between December 21, 1970 and June 21, 1971, I note and find that on December 22, 1970, Colonel Bates, the petitioner's Professor of Military Science, orally notified Mr. Rameaka of the Board's decision and told him not to worry; in January 1971, the petitioner dropped out of the University to work full time and take extension courses elsewhere. In May of 1971, he re-enrolled in the University receiving his degree on June 13, 1971.

The plaintiff attributes his conduct to a burdening work schedule because of financial difficulties and a misunderstanding of his conversations with Colonel Bates subsequent to November 9,

---

h. That, by his own admission, Cadet Rameaka desires to be relieved of his obligation to complete his Military Science courses.

j. That, on 9 November 1970, Cadet Rameaka was informed of his unsatisfactory performance in class, his numerous unexcused absences and his failure to pass any quiz or examination. Since 9 November his course average has continued to decline placing him at the numerical bottom of his ROTC class.

2. Cadet Rameaka feels that he should be relieved of his responsibility to complete the prescribed course of instruction because he no longer desires a commission in the Army nor does he desire any association with the Army. He stated that his interest in military service began to decline when he received a lottery number of 291 in December 1969. In June 1970 he was married and his interest in military service has been nil since June.

3. His numerous absences were due to oversleeping and his poor marks cannot be justified at all.

4. His attitude toward family and vocational responsibilities is very rational yet toward his academic responsibilities and ROTC in particular he displayed a very complacent attitude and total lack of responsibility.

5. He has shown no effort to improve his class performance since being placed on probation 9 November and has indicated his sub-standard performance by his poor quiz and examination grades, his poor oral participation in the classroom and his statement to the board that he does not desire to continue in the ROTC program.

6. The Board therefore finds that Cadet James G. Rameaka, Jr. willfully evaded his ROTC contract as indicated by paragraph 3–25(13), Section 1v, AR 145–1, without good and sufficient reason in that he evidenced and stated an intent not to complete the prescribed ROTC course, that being Military Science 330."

2. "d. When the board finds willful evasion and recommends action as in b(3) above, the board proceedings will be reviewed by the PMS and the appropriate institutional authorities, then forwarded through channels with appropriate recommendations to the Deputy Chief of Staff for Personnel, ATTN: RUO, Department of the Army, Washington, DC 20310, for final decision. The cadet will not be disenrolled from the ROTC prior to receipt of this decision.
The report of board proceedings will include the following:
(1) Report of board proceedings in quadruplicate or DA Form 1574 (Report of Proceedings by Investigating Officer (Board of Officers)), with findings.
(2) . . . "
b(3) pertains to disenrollment for willful evasion of the terms of the ROTC contract and that the cadet should or should not be ordered to active duty in the Reserve enlisted grade for two or four years, as appropriate.

1970 which led him to believe sanctions for willful evasion would not be imposed and that for the December 14, 1970 hearing he would not need a lawyer. He further contends he did not conclude nor believe the Board hearing was called to consider any willful dereliction on his part.

On these facts, the plaintiff argues denial of due process in several respects. He contends that prior to and at the December hearing, he was not notified he was being charged with willful evasion; that he was discouraged from obtaining legal counsel, having been led to believe he did not need an attorney; that he was not advised of his rights to appeal; and that there is no basis in fact to support the finding of the Board of willful evasion of contract. It is conceded the petitioner was not advised as to any appellate rights.

## CONCLUSIONS OF LAW

In support of the claim of inadequacy of notice, emphasis is placed on question 4 of the "Report of Proceedings by Investigating Officer." (DA Form 1574.) It is contended it mandated that the petitioner be confronted with the specific allegations to be heard by the Board and that failure to comply invalidates the notice; that this failure, when contrasted with the language of the probationary letter of November 9, 1970, impresses upon the December 9, 1970 notice the single meaning that the hearing was to determine whether to disenroll the petitioner or at some future time to ". . . bring action against him for willful evasion." Strengthening this stand, he points out that the probationary letter certainly states willful evasion is not to be considered until after the end of the semester and paragraph 2 of the Decem-

ber 9, 1970 letter unequivocally advises that the hearing action was taken because of "demonstrated performance, attitude and aptitude" which are grounds for disenrollment but not for willful evasion.[3]

I do not view this argument as sheer sophistry but rather find it quite convincing in the context of the procedural due process issue at hand. I can do no better than to start by quoting from Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) (*Larche*).

"Since the requirements of due process frequently vary with the type of proceeding involved . . . we think it is necessary at the outset to ascertain both the nature and function of this commission. . . ."

"The specific constitutional question . . . is whether persons whose conduct is under investigation by a governmental agency of this nature are entitled, by virtue of the Due Process Clause, to know the specific charges that are being investigated. . . ."

"Due process is an elusive concept. . . . Whether the constitution requires that a particular right obtained in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding are all considerations which must be taken into account. . . ."

*Larche* concerned actions of the United States Commission on Civil Rights which had received accusations that certain Louisiana registrars had deprived certain citizens of the right to vote. The commission ruled that neither the identity of the complainants nor the exact charges be disclosed.

---

3. C1, AR 145-1, 3-25 sets forth thirteen different reasons for the disenrollment of a candidate from ROTC. Only the thirteenth deals with willful evasion, reading:

"Willful evasion means that the cadet has evidenced an intent to escape his obligation to complete the prescribed course of instructions without good and sufficient reason, or that he has completed the prescribed course of instructions but refuses to accept a commission when offered."

This thirteenth ground is the only one that carries with it active duty call whereas the others result in dropping the candidate from the program.

Viewing the finding of *Larche* in isolation, it might appear no violence was committed in this case to the due process procedures employed. However, its teaching that consideration be given to "The nature of the alleged right involved, the nature of the proceedings and the possible burden on that procedure . . ." bring me to a different conclusion.

Here we have a man's liberty at stake for alleged violations of Army Regulations to be cast before a Board in what was certainly intended to be an adversarial hearing. That this was so is demonstrated by the meticulousness of affording the right to counsel, cross-examination, and full opportunity to rebut adverse allegations. AR 15–6, sec. 8, 11, "Procedure for Investigating Officers and Boards of Officers Conducting Investigations." [4] The minima such a proceeding requires is a constitutionally adequate notice, for how else can one defend oneself.

■ At the threshold certain controlling decisional precedents must be recognized. First, courts will not ordinarily review discretionary military orders, and secondly, this ". . . does not imply that any action by the Army even one violative of its own regulations is beyond the reach of the courts." Of the former, we find the following in Hammond v. Lenfest, 2 Cir., 398 F.2d 705, 710:

". . . that 'judges are not given the task of running the Army * *. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.' Or-

loff v. Willoughby, supra, 345 U.S. 83 at 93–94, 73 S.Ct. 534 at 540, 97 L.Ed. 842. Judicial hesitancy when faced with matters touching on military affairs is hardly surprising in view of the doctrine of separation of powers and the responsibility for national defense which the Constitution, Art. 1, § 8, cl. 1 and Art. 11, § 2, places upon the Congress and the President. Moreover, the ever present and urgent need for discipline in the armed services would alone explain the relative freedom of the military from judicial supervision."

In Smith v. Resor, 406 F.2d 141, 145 (*Resor*), we find support for the latter:

"Although the courts have declined to review the merits of decisions made within the area of discretion delegated to administrative agencies they have insisted that where the agencies have laid down their own procedures and regulations, those procedures and regulations cannot be ignored by the agencies themselves even where discretionary decisions are involved."

(Citing United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); Yellin v. United States, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957)).

This very Court recognized and adopted this principle in Murray v. Blatchford, D.C., 307 F.Supp. 1038, 1053.

Because *Resor* deals with constitutional precepts which stand above a Military Jurisprudence which violates the same, its vitality is not diluted by recognizing that

"Military law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal judicial estab-

---

4. Section 8:
    "An individual under investigation is entitled to have counsel, either military or civilian. . . ."
  Section 11:
    "An individual whose conduct, efficiency, fitness, or pecuniary liability is under investigation and who has been notified pursuant to paragraph 6 will, except for good cause shown, be permitted to be present at all open sessions and to cross-examine adverse witnesses. . . ."

lishment. This Court has played no role in its development; we have exerted no supervisory power over the courts which enforce it; the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. The Framers expressly entrusted that task to Congress."

Burns v. Wilson, 346 U.S. 137, 139–140, 73 S.Ct. 1045, 1047, 97 L.Ed. 1508 (1953) (*Burns*).

■ It must follow, therefore, in the scope of constitutional rights, that when the military has not dealt fully and fairly with an allegation raised by a military complainant (*Burns, supra*, 73 S.Ct. at 1048), it leaves its actions open for judicial scrutiny.

I will first deal with the adequacy of notice. That the notice given lacked specificity can hardly be denied when viewed in the totality of the circumstances in the order of their development.

■ ■ First, I accept as true that the ROTC problems experienced by the petitioner reflected his domestic difficulties and that the various conversations with Colonel Bates, though they covered the aspect of willful evasion, nevertheless, also included all the other reasons warranting disenrollment without call to active duty and did advise him not to worry. Secondly, the November 9 letter does not apprise him of willful evasion; it clearly states a further review would be made at the end of the semester and that at that time he might be considered for dismissal from the program and possible charges of willful violation. Thirdly, the December 9 letter of notification clearly supports his belief and the view of Colonel Bates that the subject matter of the Board's

concern was limited to "possible disenrollment from the Advanced ROTC Program" which wording does not necessarily carry with it considerations of willful evasion of his obligation—either expressly or by necessary implication.

These ambiguities lead to the single conclusion that there never was given to Rameaka a notice of ". . . specific allegations or questions to be investigated." The opening statement by the President of the Board offers no cure. On the contrary, as the petitioner argues, it only adds to the confusion.

Petitioner argues that this failure to give adequate notice is in violation of the Army's own regulations and procedures. Thus, the question remains whether question 4 on DA Form 1574 has the dignity of a military rule or regulation so integrally woven as part of the Board proceedings that if breached constitutes a violation of its own regulatory framework for hearings pursuant to AR 15–6.

I reason that it does. This is a Department of the Army form used throughout the service and before action may be taken, C1, AR 145–1 requires it be forwarded to the Deputy Chief of Staff for Personnel, Washington, D. C., together with all other papers.

True, copies of correspondence to the cadet must also be sent but to me it is inescapable that this form with its conclusionary statements must play a vital role and stands as the guide, signalling and recording all conditions precedent to a valid hearing. Saying otherwise attributes to the Deputy Chief of Staff a demand for useless information and it is mere caviling to argue "Each notification stated specific allegations or questions to be investigated" means something less precise. Further support for this position is found in the order appointing the Board.[5] In promul-

---

5. "Sp Instr: After hearing all evidence in each case, recommend that one of the following actions be taken:

    a. The cadet be retained in the ROTC program.

    b. The cadet be disenrolled from the ROTC program for reasons other than

willful evasion of the terms of his ROTC contract.

    c. The cadet be disenrolled from the ROTC program for reasons that indicate he willfully evaded the terms of his ROTC contract and he should not

gating it, the Army deemed it necessary to carefully enumerate as special instructions all the various separate possible findings. It seems to me this demand for specificity should require nothing less by way of notice to a respondent called before it. Thus, it appears that there was no discretion in the Board to give or to withhold adequate notice and this case does not raise issues of judicial interference with military discretion. See Winters v. United States, 281 F.Supp. 289, 299 (E.D.N.Y. 1968).

Having been misled, as I conclude he was, Rameaka may have been willing to take his chances alone without counsel if the worst meant being dropped from the ROTC program but might otherwise have obtained counsel if he had realized the end result was a call to active duty. The fundamental due process wrong is not only the inadequacy of the notice but also that he was led to believe he did not need counsel. Such a combination of acts by the Army plays lightly with a man's liberty. It denied him an opportunity for vigorous and informed adversarial confrontation on the issues. The Army intended this to be and utilizes DA Form 1574 to insure that every step toward that end has been taken. It is the tangible guide to assure full and fair dealings. They failed to follow their own procedures—a breach of constitutional dimension, entirely appropriate for review by this Court. The prejudice resulting to petitioner is great. He should be given the opportunity to combat the distinct charge of willful evasion.

be ordered to active duty in his Reserve enlisted grade.

d. The cadet be disenrolled from the ROTC program for reasons that indicate he willfully evaded the terms of his ROTC contract and he should be ordered to active duty in his Reserve enlisted grade for 2 or 4 years as appropriate."

The government's reliance on Hickey v. Secretary of Army, 320 F.Supp. 1241 (D.Mass.1971) is misplaced. Judge Caffrey there found that the Army had correctly followed its own requirements in giving notice to the petitioner, 320 F. Supp. at 1246.

The lack of due process is further exacerbated by the failure to advise the petitioner that he had a right to appeal from the proceedings.

On December 22, 1970 when orally advised of the Board's findings, Colonel Bates, and I so find, told petitioner not to worry. To the uninitiated in such procedural matters this ·is as clearly prejudicial as if advice were given that there was no right to appeal. It effectively foreclosed any immediate remedies Rameaka might otherwise have contemplated. Rather than seek prompt help, he left school in January and enrolled in extension courses elsewhere. In May he returned to the University of Rhode Island and received his degree on June 13, 1971 and as previously recited, was notified nine days thereafter of his disenrollment for willful evasion.

I find petitioner is entitled to relief on balance with the right of the military not to be foreclosed from properly pursuing its remedies. Treating this action as a mandamus proceeding,[6] I direct the Army to permit petitioner another hearing before a duly constituted Board of Officers, first notifying him specifically of the allegations placed against him relevant to C1, AR 145–1 and the findings it might make as set forth in the order, supra, n. 4.

6. 28 U.S.C. § 1361:
"The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."